**470**

**RIGHTMEYER**
v.
**VON LENGERKE BUICK CO.**
Civ. A. No. 617–52.

United States District Court
D. New Jersey.
Nov. 19, 1953.

Malkin & Malkin, Hackensack, N. J., By: Julius L. Malkin, Hackensack, N. J., for plaintiff.

Hunziker & Hunziker, Paterson, N. J., By: Walter J. Hunziker, Paterson, N. J., for defendant.

MODARELLI, District Judge.

The broad issue in this case is whether or not the 1951 Buick automobile, Model 72 R, which was purchased by plaintiff from defendant on or about March 31, 1952, was a "used" automobile within the meaning of Ceiling Price Regulation 94 (16 F.R. 11639), or a "new" automobile within the meaning of Ceiling Price Regulation 83 (16 F.R. 10594).

Ordinarily the court would not have too much trouble in deciding whether a car is "new" or "used". It was always said in the automobile industry that when a car left the showroom in the hands of the ultimate user or owner it was a used car. But along came the Defense Production Act of 1950, 50 U.S. C.A.Appendix, § 2061 et seq., and made this momentous question "a federal case". This is another example of the difficulties of trying to control human activities by tomes of government regulations and armies of government regulators. A job attempted to be done that way is never really done but has to be done over and over again by more and more regulations, and more and more regulators. Many times during my service as United States Attorney it developed that some of the governmental regulations were so complex that nobody but the drafter of the regulation knew what it meant. These conditions naturally result in confusive enforcement and its legal concomitants. Good people who never violated a law in their lives nor ever intended to, suddenly find out that under this mass of regulation they become law breakers subject to penalties. With all this in mind, I approach my decision in this case.

On or about March 20, 1952, plaintiff and defendant-corporation entered into an agreement, as a result of which plaintiff purchased a 1951 Buick automobile, Model 72 R, for the price of $3,095. The transaction was consummated on or about March 31, 1952. The testimony developed that the original contract described the car as "used" but the plaintiff testified that he was compelled to surrender the contract before delivery to him of the automobile. Before he surrendered, he had enough foresight to have a photostatic copy made of the original contract. The plaintiff then entered into a new contract covering the same automobile, and in this contract the vehicle was described as a "demonstrator or executive auto". The original contract which was returned by the plaintiff to the defendant was entitled "used car contract" and the one substituted in its place was entitled "new car contract". Strangely enough both contracts were dated March 20, 1952. The new car contract contained the rubber stamp legend thereon "Order subject to present and future governmental regulations." Hence this litigation.

Section 11(2) of C.P.R. 94 defines a used auto as one "which has been sold at retail * * * A demonstrator or dealer owned executive car is a used automobile if the model is not currently being sold by the manufacturer or was not sold by the manufacturer within the preceding 4 months. * * *" Section 11(g) defines a sale at retail as "any sale to an ultimate user." Section 11(g) (3) states the term "sale" includes "sell, supply, dispose, barter, exchange, transfer and deliver * * *."

Section 18(a) (2) of C.P.R. 83 defines a "new" auto as one which has "never been sold at retail. * * *" Section 18(d) defines a dealer as "any person other than the manufacturer who is generally engaged in the business of selling new automobiles."

■■ And so it would seem that the narrow issue presented for determination is: Whether or not, prior to the sale to the plaintiff by the defendant, the Buick automobile in question was sold, supplied, disposed, bartered, exchanged, transferred, or delivered to an ultimate user. I find as a fact that the auto was transferred to an ultimate user. It is indisputable that in the years 1951 and 1952, the automobile in question was registered with the State of New York Bureau of Motor Vehicles in the name of "General Motor Corporation, Buick Motor Div., 224 West 57th Street, NYC." It is common knowledge that the owner of an auto registers it with the proper authorities. Since the registrant was not the manufacturer of the auto, there was a "sale"—if but a mere "transfer" of possession—within the definition of that term.

■ I find as a fact that General Motor Corporation, Buick Motor Division, was an "ultimate user" within the meaning of the regulation. The phrase is nowhere defined in the regulation, but a careful reading of the same indicates clearly that it means all users other than dealers. The clear intent of the words used in a section of the regulation is designed to include within the meaning of "used" autos, all autos which were transferred in any way from the manufacturer to anyone not a dealer. It is established by the evidence that the New York registrant of the Buick was not a licensed dealer in New York or New Jersey because it does not sell at retail nor buy autos for resale. It was further established that it owns cars, including the car in question, for use by its personnel. It was further established that the car had been driven between 3,000 and 5,000 miles before it was delivered to the defendant for resale. Regulation or no regulation it could never be said that a car driven and registering that much mileage could by any stretch of definition be a "new car." It is, was, and will be a used car, and I so find.

While it does not influence the court in reaching a decision, it is worthy of note that the basic definition of a "new" automobile was amended by Revision 1 of C.P.R. 83, effective August 23, 1952, to exclude therefrom an automobile which had been used prior to sale by the manufacturer.

■ The court is urged by the defendant to consider the equities between the parties in this transaction. There is no citation needed to show that under broad purposes of all price regulations, the court cannot consider the equities between the parties but must enforce the regulations to the fullest degree in order to accomplish the purposes intended.

■ Defendant further contends that there was "no wilful or unlawful violation of regulations." While I am satisfied in ordinary parlance that the defendant did not wilfully violate the regulation, I am compelled to find under the regulation itself that it did. The defendant admits that it communicated with the Newark Office of O. P. S. concerning this transaction. Defendant further admits that the representative in the Newark Office would give no opinion but suggested that the defendant make an inquiry in writing outlining the facts in the case and it would receive a written reply. This the defendant failed to do but chose rather to rely upon the opinions of persons not connected with O. P. S., which is not the practical precautions to be relied upon in order to avoid a violation of the O. P. S. Regulations. Section 7 of C.P.R. 94 provides: "If you have any doubt as to the meaning of this regulation, you should write to the District Counsel of the proper OPS District Office for an interpretation. Any action taken by you in reliance upon and in conformity with a written official interpretation will constitute action in good faith pursuant to this regulation * * *." Had the defendant complied with this section, it would be absolved from any wilful intent. Having failed to do so, the court must find wilfulness.

The evidence also disclosed that when the question arose as to whether the automobile was new or used, the defend-

ant offered to cancel the contract and return the deposit. This offer was refused by the plaintiff because autos were in short supply during March of 1952, and the plaintiff was anxious to purchase the car. This circumstance convinces me that the defendant was not a wilful violator in ordinary parlance. Of course, sellers can only be so generous when their commodity is in short supply. Now that automobiles are abundant, I do not believe the sellers would be so generous.

There will be a judgment in favor of the plaintiff and against the defendant for two times the amount of the overcharge, including the overcharge, attorneys' fee of $100, and the plaintiff's costs of court.

An order may be submitted in conformity with the opinion herein expressed.